Upon review of the competent evidence of record with respect to the errors assigned, the Full Commission finds good ground to reconsider the evidence. Having reconsidered the evidence of record, the Full Commission reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
************
The Full Commission finds as facts and concludes as matters of law the following which were entered into by the parties through the Pre-Trial Agreement and at the hearing as:
 STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers Compensation Act.
2. The employee-employer relationship existed between plaintiff-employee and defendant-employer.
3. Great American is correctly designated as the carrier on the risk.
4. Plaintiff contends that his average weekly wage is approximately $588.42, yielding a compensation rate of $393.28.
5. Plaintiff further contends that he suffered a compensable injury by accident to his head, neck, and back on 3 September 1997, while driving a tractor for defendant-employer.
6. Defendants contend that plaintiffs average weekly wage is approximately $398.81, yielding a compensation rate of $265.88.
7. Defendants further contend that the injury suffered by plaintiff on 3 September 1997, while driving a tractor for defendant-employer was caused by an idiopathic condition and is not related to his employment.
8. At the outset of the hearing before the deputy commissioner, defendants stipulated that they were not pursuing the intoxication defense that was listed on their Form 61 Denial of Workers Compensation Claim and Form 33R Response to Request that Claim be Assigned for Hearing.
***********
 EVIDENTIARY RULINGS
The objection by plaintiffs counsel to the testimony of Andrew P. Mason, Ph.D., as noted on page 12 of the deposition transcript, is OVERRULED.
***********
The Full Commission finds as fact the following:
 FINDINGS OF FACT
1. Plaintiff was forty-three years old on the date of the hearing before the deputy commissioner. Plaintiff completed the eleventh grade and had no further training other than on-the-job training. Plaintiff has worked in manual labor jobs. He worked at Pine State, driving a forklift for eight years, and he also worked assembling computers at Data General for four years.
2. Plaintiff worked on and off for defendant-employer for about nine years. At one point he left due to disagreement with his manager, who was also his brother. Plaintiff worked in sanitation for the town of Cary for about a year. His last period of employment with defendant-employer began around March 1997.
3. Plaintiff drove a tractor with a bush hog attachment, which is a heavy-duty mowing machine. Plaintiff operated the tractor and mower to maintain the right of ways for gas pipelines in North Carolina. He mowed in an area from Greensboro, North Carolina, to near Spartanburg, South Carolina, and he generally worked Monday through Friday.
4. Plaintiff operated the tractor from an elevated position approximately four feet above the ground. These tractors are similar to farm tractors and have four large rear wheels. The tractor also had a roll bar and a cover to shield from the sun. The seat is cushioned with back and arm support and a seat belt for the driver. Plaintiff mowed over fairly level ground, but sometimes he mowed over steep inclines, ditches, and rough terrain.
5. When driving the tractor, there was the potential that the operator could fall off, particularly if the ground was not level and the driver was not wearing a seatbelt.
6. On 3 September 1997, plaintiff was operating the tractor with the bush hog attachment in Rowan County. Due to the hot temperature that morning, plaintiff sweated heavily and suffered from heat cramps in his extremities. It was common for employees to suffer heat cramps on hot days. Plaintiffs supervisor provided Legatrin PM tablets for the employees to prevent their cramps. Legatrin PM is a non-prescription product that contains 50 milligrams of diphenhydramine hydrochloride (Benadryl) and 500 milligrams of acetaminophen (Tylenol) per tablet. The normal dosage is one tablet, but two tablets could be well tolerated without a high risk of side effects. Taking tablets in excess of the recommended dosage could cause side effects such as drowsiness, dizziness, or vertigo. Plaintiff took two Legatrin PM tablets on 3 September 1997.
7. Plaintiff mowed during the morning of 3 September 1997. A bolt on the tractor broke around lunchtime, and plaintiff spent about twenty minutes performing the repair. After repairing the tractor, plaintiff continued his mowing of the right of ways.
8. On 3 September 1997, Joseph Melton was mowing hay in an adjacent field to where plaintiff was mowing the right of way. Mr. Melton had been working since early in the morning and had seen plaintiff repairing the tractor.
9. Plaintiff stopped the tractor at an area near the pipeline and appeared motionless. As Mr. Melton mowed the hay in the adjacent field, he noticed that plaintiff was sitting stiffly and not moving. Although the tractor and bush hog were running, they were not moving. Mr.Melton made about three rounds of the hay field. As Mr. Melton approached the end of the field near plaintiff, plaintiffs tractor started to move off to the right into a slight ditch, then back up into the yard in a hard right hand turn, moving very slowly. As the tractor moved back up into the yard, plaintiffs arms began flailing. Plaintiff fell off the tractor, landing on his neck and shoulder. The tractor was turning to the right and plaintiff fell off to the left side.
10. When he saw plaintiffs arms flailing, Mr. Melton became concerned that plaintiff was in trouble. He immediately stopped his own tractor and ran to plaintiffs aid. Plaintiffs entire body was rigid, and he was unconscious and had some foaming around the mouth.
11. The tractor and bush hog barely missed hitting plaintiffs head. Mr. Melton turned the tractor off and called 911 on another bystanders cellular phone. When the ambulance arrived, Mr. Melton told the attendants what he had observed. Plaintiff did not regain consciousness prior to the arrival of the ambulance.
12. The ambulance call report shows that plaintiff was hypertensive with a blood pressure of 162/118. The cardiac monitor showed plaintiff had sinus tachycardia with ectopy, which is an irregular heartbeat. Both hypertension and irregular heartbeat are characteristic of chronic alcoholism.
13. At the hospital, information was taken from plaintiff and the ambulance attendants. The emergency room physician diagnosed plaintiff with a seizure secondary to alcohol withdrawal. The physician administered a central nervous system depressant and anti-anxiety drug. Plaintiff was also given thiamine, which is commonly used for treatment of alcoholics. The laboratory work done at the hospital showed no circulating alcohol in plaintiffs blood.
14. Plaintiff likely had a seizure caused by his alcoholism. However, plaintiffs fall from the tractor, resulting in injury, was not due solely to his idiopathic condition but was also due to the fact that he was sitting four feet above the ground on a vehicle moving over uneven terrain and making a hard right turn.
15. On 6 September 1998, three days after the accident, plaintiff was seen at Wake Medical Center with complaints of neck and chest wall pain and bilateral tingling in his hands. A CT examination and x-rays were done and the physician diagnosed a fracture of the spinous process at C-7.
16. Plaintiff had follow-up treatment at UNC Hospital. He has been treated by Joe Minchew, M.D., an orthopaedic surgeon, and by two neurologists, Alan Finkel, M.D., and Albert Hinn, M.D. Dr. Minchew referred plaintiff to Dr. Hinn after the results of an MRI scan of his neck were abnormal. Dr. Hinn began treating plaintiff on 6 February 1998. Plaintiff complained of pain in his neck, tingling and numbness in his extremities, cold feet, diminished control of his fingers, and weak legs.
17. Dr. Hinn diagnosed plaintiff with neuropathy, a disease of the nerves, and with with myelopathy, a disease of the spinal cord. Plaintiffs neuropathy was a preexisting alcohol-related condition which was not caused by his fall but was probably aggravated by the fall and the resulting myelopathy. Plaintiffs fractured vertebrae, spinal cord lesion, and myelopathy were caused by the 3 September 1997 injury by accident.
18. Thomas E. Curtis, M.D., a psychiatrist, evaluated plaintiff and diagnosed him with clinical depression in May 1998. Plaintiff drank alcohol to alleviate the pain he was experiencing from the accident and because of his inability to work due to his injuries. Plaintiffs depression is related to his fall from the tractor on 3 September 1997.
19. At the time of the hearing before the deputy commissioner, plaintiff suffered from numerous medical conditions, including a fracture of his spinous process, an abnormal lesion of the cervical spinal cord, an unsteady gait, depression, and a combination of neuropathy and myelopathy. Plaintiff had not reached maximum medical improvement and has not been released to return to any type of work.
20. Due to injury by accident, plaintiff was unable to work in any employment from 3 September 1997 and continuing.
21. According to the stipulated Form 22 Statement of Days Worked and Earnings of Injured Employee, plaintiff earned $10,255.05 with defendant-employer.
22. Defendant-employer paid plaintiffs hotel bills when he was required to stay out of town overnight. In addition, plaintiff was paid $10.00 per day for his meals when on a job out of town. This per diem was not paid to plaintiff in lieu of wages.
23. During the period of his employment, but prior to the accident on 3 September 1997, plaintiff missed seven weeks of work.
***********
Based upon the foregoing findings, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On 3 September 1997, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. G.S. 97-2(6); Mills v. City of New Bern,122 N.C. App. 283, 468 S.E.2d 587 (1996).
2. Plaintiff is entitled to receive total disability benefits from 3 September 1997 and continuing until plaintiff returns to work or until further order of the Commission. G.S. 97-29.
3. To compute an average weekly wage that is fair and just to both parties, the 7 weeks when plaintiff did not work before his injury by accident should not be included in the number of weeks that plaintiff earned wages. Accordingly, plaintiffs average weekly wage is properly computed by dividing his earnings of $10,255.05 by 18.7 weeks, which equals $548.40, resulting in a compensation rate of $365.78. G.S. 97-2(5).
4. Plaintiff is entitled to have defendants pay for medical expenses incurred, or to be incurred, as may be reasonably required to effect a cure, provide relief, or lessen plaintiffs period of disability. This includes the treatment for depression. G.S. 97-2(19).
5. Plaintiffs attorney requests a fee of 25% of the compensation awarded, which is a reasonable fee in this case. G.S. 97-90(a), (c).
***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission reverses the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Subject to attorneys fees hereinafter provided, defendants shall pay plaintiff compensation benefits at the rate of $365.78 per week from 3 September 1997 and continuing until plaintiff returns to work or until further order of the Commission.
2. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of his compensable injury when bills for same have been submitted to and approved by the Commission, for so long as such evaluations, treatments, and examinations may reasonably required to effect a cure, give relief, or lessen plaintiffs period of disability.
3. An attorneys fee of 25% of the compensation due plaintiff under this Award is approved for plaintiffs counsel and shall be paid as follows: 25% of the accrued amount due plaintiff shall be deducted and paid directly to plaintiffs counsel. Thereafter, plaintiffs counsel shall receive every fourth compensation check.
4. Defendants shall pay the costs and the expert witness fees previously approved for Dr. Hinn and Dr. Mason, as well as an expert witness fee of $250.00 to Dr. Thomas Curtis.
S/________________ RENÉE C. RIGGSBEE COMMISSIONER
CONCURRING:
S/_______________ LAURA K. MAVRETIC COMMISSIONER
S/_______________ CHRISTOPHER SCOTT COMMISSIONER